AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT
### for the
### District of Hawaii

| | |
|---|---|
| United States of America<br>v.<br><br>Michael Vaituulala | )<br>)<br>)<br>)<br>)<br>)<br>) |

_____
Defendant(s)

Case No.  MJ 26-00746 KJM

**FILED UNDER SEAL PURSUANT TO<br>CRIMLR5.2(a)(1)**

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of on or before 1/1/24 and continuing to 7/31/26  in the county of _____Maui_____ in the _____ District of  Hawaii and elsewhere , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § § 1343, 1345, and 1349 | conspiracy to commit wire fraud by devising a scheme to defraud and deprive another of the intangible right of honest services |

This criminal complaint is based on these facts:

See attached Affidavit in Support of Criminal Complaint.

☑ Continued on the attached sheet.

_____
Complainant's signature

Bryanna Jones, Special Agent, FBI
_____
Printed name and title

Sworn to under oath before me telephonically, and attestation acknowledged pursuant to Fed.R.Crim.P. 4.1(b)(2).

Date:      July 31, 2026                                  _____
                                                            Judge's signature

City and state:          Honolulu, Hawaii          Kenneth J. Mansfield
                                                    United States Magistrate Judge

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Bryanna Jones, being first telephonically sworn, state the following is true and correct to the best of my knowledge and belief:

1.      I am a Special Agent with the Federal Bureau of Investigation (FBI) and have been since September 2022. I am currently assigned to the Honolulu Division, White Collar Squad. My duties include, among other things, the investigation of public corruption. During my employment with the FBI, I have investigated and participated in investigations involving state and federal criminal violations related to public corruption matters. I have received training on a variety of investigative and legal matters, including the topics of Fourth Amendment searches and seizures, the drafting of search warrant affidavits, and requisite probable cause. I have utilized court-authorized search warrants, conducted physical surveillance, and interviewed subjects and witnesses. As a federal agent, I am authorized to investigate violations of the laws of the United States. I am a federal law enforcement officer with the authority to execute search and arrest warrants under the authority of the United States. Due to my training and experience as an FBI Special Agent, I am familiar with the United States Criminal Code.

2.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, law enforcement personnel, and witnesses. This affidavit is intended to show only that

1

there is probable cause to believe that MICHAEL VAITUULALA committed the offenses charged in the Criminal Complaint and does not set forth all my knowledge about this matter. I have only set forth the facts that I believe are necessary to establish probable cause.

## **PROBABLE CAUSE**

3.     This affidavit is submitted for the purpose of establishing probable cause that MICHAEL VAITUULALA committed the offense of conspiracy to commit honest services fraud in violation of Title 18, United States Code, Sections 1343, 1346 and 1349.

4.     The defendant, MICHAEL VAITUULALA, is a lieutenant with the Maui Police Department (MPD) and has been a police officer with the MPD since 2008.

5.     The residents of the County of Maui have a right to the honest services of a police officer employed by MPD.

6.     The defendant entered into an agreement with one or more individuals to devise and knowingly participate in a scheme to defraud the residents of Maui by depriving them of their right to his honest services.

7.     Under Hawaii Statute § 710-1040, it is unlawful for a police officer and public servant to accept and agree to accept, directly or indirectly, any pecuniary

2

benefit with the intent that that person's judgment, exercise of discretion, or other action as a public servant be thereby influenced.

8.    The defendant accepted cash payments from individuals involved in animal fighting in exchange for using his official position to ██████████ ████████ not enforce animal fighting laws against those individuals.

9.    The defendant accepted cash payments from individuals involved in crimes against the State of Hawaii and the United States, including drug trafficking, in exchange for using his official position to provide those individuals with confidential information about ongoing criminal investigations into their criminal activities.

10.    Cooperating Defendant #1 (CD #1) told investigators during 2023 and 2024 that an acquaintance had talked to a police officer, later identified as VAITUULALA, and told CD #1 that he should stop what he was doing [dealing drugs] and "clean house."  CD #1 understood that VAITUULALA was, through the acquaintance, warning CD #1 that there was an investigation into his drug trafficking activities.

11.    According to Cooperating Defendant #2 (CD #2), CD #1, while out on bond pending trial in a federal prosecution in 2024, was bragging at a social event that CD #1 was talking to federal investigators about a cop named "Mike" [VAITUULALA].   CD #2 then ran into VAITUULALA at a bar and told

3

VAITUULALA that CD #1 was providing information to the FBI.  VAITUULALA responded, "I already knew that.  When you try to help people, be careful who you help."   VAITUULALA said that he had heard about it about a year before.[1]

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████

12.    According to Cooperating Witness #1 (CW #1) and Cooperating Witness #2 (CW #2), CW #1 wanted to create a place to hold chicken fights on Maui on Saturdays.[2]  CW #1, CW #2, and CD #2 told FBI agents that Person 1 ran chicken fights on Sundays, and CW #1 and CW #2 wanted to create a second venue for chicken fights.  CW #1 and CW #2 said that they met with VAITUULALA ████ ████████████████████████ in late 2024 or early 2025 to discuss whether they would be allowed to run chicken fights.  ████████████████████████ ████████ the events (1) would need to be held at a location that would not cause parking problems or complaints from the neighbors, (2) security at the events was required, and (3) people from outer islands would not be allowed in the pit to release the chickens.  ████████████████████████████████

---

[1] The timing is consistent with when CD #1 first proffered with federal agents.

[2] Animal fighting, including chicken fighting for the purposes of sport, wagering, or entertainment is a federal felony offense.

4

██████████████████████████ VAITUULALA, agreed that CW #1 and CW #2's fights would be on Saturdays because Person 1's fights took place on Sundays.  VAITUULALA approved of CW #1 and CW #2 opening a chicken fighting location.  CW #2 had the impression that there was an agreement, "We scratch your back, you scratch ours."

13.    Investigators executed a search warrant on CW #1's phone and found a note discussing the agreement that was made with VAITUULALA ████████ ██████:

> The agreement was [Person 1] would take the first weekend of the month, and the rest would run as 2s.
>
> Even you reached out about doing a 3 [cock fight] a day before Casco [a chicken fight], which wasn't part of the original understanding.  But that tells me that you knew the agreement brother.  Once you asked me I talked to [CW #2] because he thought that was going to cause issues with the Casco.  But I asked him to let it go and he said fine.
>
> We're not trying to cause any issues we just want to make sure the word we all agreed on is being honored moving forward.  The first week is the most valuable week to run so much reasons but mostly it's when people get their financial assistance.
>
> I finally got them to stop running big once's the day before your big one and that was due to [Person 1] not keeping his word on not going into may before talking.
>
> When a man gives his word and seals it with a handshake, we expect it to stand.  That's how respect is kept.  If something needs to change, then we talk but until then, the agreement is the agreement brother.
>
> This year was set.

5

14.    According to CD #2, CW #1, and CW #2, after the meeting with VAITUULALA, ███████████████████████ CD #2 found a location for the chicken fights.  CW #1 and CW #2 provided funding, equipment, and labor to build a pavilion and a chicken fighting pit.  The first fight was held in February 2025.

15.    Investigators obtained search warrants for CD #2, CW #1, and CW #2's cellular phones and found marketing materials for the chicken fights suggesting that the advertising was open and obvious to residents of Maui.  For example, the following flyer was widely distributed over Instagram.



16.    According to CD #2, CW #1, and CW #2, VAITUULALA ███ ████████████████████████████ knew about the dates and times of the chicken fights run by CW #1 and the chicken fights run by Person 1.  ██████ ████████████████████████████████████████████ ███████████████

17.    Investigators executed a search warrant on CW #2's cellular telephone

and located a text conversation between CW #2 and CW #1 that began on April 10,

2025:

| | |
|---|---|
| CW #2: | Tell [Person 2] we already get one 3 cock scheduled for May 10th so have him move it to our side. |
| CW #2: | He we won't agree to that then it is what it is. |
| CW #1: | At this point I would just run em |
| CW #1: | I think regardless most people going show up to his |
| CW #1: | That's a derby every weekend bro ███████ |

. . .

| | |
|---|---|
| CW #1: | My fear is they [the other chicken fighting faction] been doing 1-2 each month. We been doing 2. That schedule going probably upset ████ VAITUULALA ████████ but it's up to you. I would suggest keeping it at 2 per month |
| CW #2: | At this point I gotta try and do volume with events. This [Person 2] one [another chicken fight] threw a major curve ball cause now we competing against people that are suppose to be our friends. |
| CW #1: | I agree |
| CW #1: | ████████████████ |
| CW #2: | Agree 100% |

7

According to CW #1 and CW #2, they had an agreement with VAITUULALA ████ ████████████████ setting the rules for chicken fighting season and they were concerned that CW #1 and CW #2 would violate the rules ████████████████ ██████████. They began discussing a 3-cock fight that was going to take place in May, and that their friend, Person 2, was also staging a fight. They expressed concern that Person 1's chicken fighting operation would break the rules that were put into place during their discussions with VAITUULALA ████████████████ Derbies are larger chicken fights that go on for longer periods of time and attract more fighters and spectators. CW #1's understanding was that the number of derbies would be limited. CW #1 was concerned that he and Person 1 were hosting too many derbies. ████████████████████████████

████████████████████████████

████████████████████████████

████████████████████████████

████████████████████

18.     According to CW #1 and CW #2, they had an agreement with VAITUULALA ████████████████ about the rules for the 2025 chicken fighting season. CW #1 and CW #2 were concerned that they would violate the rules ██ ████████████████████████. They were also concerned that Person 1 was not adhering to the rules and that was not fair.

8

19. According to CW #1, CW #2, and CD #2, CW #1 wanted to allow individuals from outer islands to attend the chicken fights. During the first meeting ███████████ VAITUULALA ███████████████████ would not agree to that. According to CW #1, CW #2, and CD #2, they later received permission from VAITUULALA ████████████████████ to allow off-island attendees, but the off-islanders could not release their own chickens.

20. CD #2 said that CW #1 would pay VAITUULALA on Sundays after the chicken fights and that CW #1 would pay a percentage of the proceeds from the chicken fights. CD #2 said that he was with CW #1 on one occasion in February 2025 when CW #1 paid VAITUULALA. The three of them met at Wailuku Industrial Park. CD #2 said that the low end of the payments CW #1 made to VAITUULALA was $3,000.

21. According to CW #1, he paid VAITUULALA on Saturdays during the chicken fighting season that began in February 2025 and ran at least until CD #2's arrest on drug trafficking charges in June 2025. CW #1 said that he did not pay VAITUULALA a percentage of the chicken fighting proceeds because he wasn't making anything from the chicken fights. Rather, CW #1 paid VAITUULALA with his own money. CW #1 said he would call VAITUULALA or contact him over Instagram Voice. CW #1 said that VAITUULALA would never answer CW #1's phone calls, but he would call him back over Instagram. According to CD #2,

9

VAITUULALA told CW #1 that he should not communicate using a cellular telephone, but he should use Instagram, Signal, or Facetime or other encrypted applications to avoid law enforcement detection. VAITUULALA also said that they should use burner phones, not their personal cell phones.

22.    CW #1 told me that he and VAITUULALA would arrange to meet at CW #1's business. CW #1 would then get into VAITUULALA's vehicle. Immediately upon getting inside VAITUULALA's vehicle, CW #1 would open the glove compartment and place thousands of dollars in cash inside the glove compartment. CW #1 said the amount of the payments varied. When CW #1 first started paying VAITUULALA, he said he would take his shirt off to show VAITUULALA he wasn't wearing a wire. CW #1 and VAITUULALA did not discuss what the payment was for but based upon the timing of the payments during the chicken fighting season, CW #1 understood that the payment provided him, CW #2, and CD #2 with protection against enforcement actions. CW #1 said that after a while, he had gained VAITUULALA's trust and no longer took his/her shirt off before the meetings. After placing the cash inside the glove compartment, VAITUULALA would drive around the area and CW #1 and "talk story."

23.    CD #2 told FBI agents that CD #2 asked CW #1 about VAITUULALA's use of Instagram and CW #1 said that VAITUULALA used FaceTime, Signal, and

10

other encrypted applications to communicate.  I believe that VAITUULALA used encrypted applications so that his illegal activities would not be detected.

24.   CW #1 said that he routinely communicated with VAITUULALA over the Instagram application.  I know, based upon my training and experience, that Instagram communications occurring within the State of Hawaii, are wire communications in interstate commerce routed outside the State of Hawaii.

25.   CD #2 told FBI agents that in March or April 2025 VAITUULALA told CW #1 that CD #2 was losing VAITUULALA'S respect because CD #2 was not managing the parking for the derbies.  VAITUULALA thought that CD #2 should step up and manage the parking.  CD #2 shared that he just wanted to breed, sell, and fight chickens and that he didn't want to manage the chicken fighting.  On one occasion, VAITUULALA went to the chicken fights and told CW #1 to have CD #2 move the cars.  CD #2 said that CW #1 paid VAITUULALA in cash the same day because CW #1 walked down from the chicken fights to talk to VAITUULALA.  The cash payment was intended to ensure that the chicken fight could continue if the parking situation was managed.

26.   CD #2 said that Person 1 paid VAITUULALA twenty percent of what he made.  CD #2 also said that Person 1 and VAITUULALA were always together and whenever CD #2 would see VAITUULALA and Person 1 at the bars, Person 1 would pay VAITUULALA's tab.  CD #2 believed Person 1 paid the tab as

11

compensation for VAITUULALA allowing the chicken fights to run without law enforcement intervention. Person 1 hosted chicken fights for a few years before CW #1 and CW #2 got permission from VAITUULALA ███████████████████ ███████████████ .

27.   On February 12, 2025, CD #2 mailed parcels containing cocaine and methamphetamine from a post office in San Diego to Maui. One of the parcels was intercepted by the United States Postal Inspection Service. The return address on the parcel was one of CW #1's business locations. ████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

█████████   The parcel was mailed to Maui.

28.   On February 20, 2025, the USPIS executed a search warrant on the parcel in the District of Hawaii and approximately nine kilograms of methamphetamine and six kilograms of cocaine was seized from the parcel. After the drugs were seized, the FBI sent the packaging to a laboratory on the mainland to check for fingerprints. The USPIS also obtained surveillance footage of CD #2 mailing the package and provided the footage to the FBI. Still photos of the surveillance footage from the post office were included in the confidential case file.

29.   In March 2025, an MPD confidential informant (CI) advised ██████ ██████ that CW #1 was distributing cocaine and methamphetamine. The CI said

12

that CW #1 showed him a picture from the "hidden" folder on CW #1's phone of CD #2 at the post office. The CI ████████████████████ saw a photograph on CW #1's phone that depicted CD #2 wearing a pink shirt and mailing a package at the post office. CW #1 told the CI that he had contacts in law enforcement in Hawaii. (CW #1 denies having the photograph on his phone. CW #1 said that it was the CI who showed him the photograph, but they both agree that they saw the evidence photo or photos of CD #2 mailing the package of narcotics.) A photograph of CD #2 mailing a package is depicted below:



30.     CD #2 said that CW #1 told him about the drug investigation.  CW #1 then reached out to VAITUULALA after hearing about CD #2's case.  CW #1 learned ████████████████████████████████ that the package would be tested for fingerprints and that the package had been sent to the mainland.  CD #2 said that CW #1 needed CD #2 if he was going to continue to run the chicken fights, so he was trying to keep CD #2 out of prison as long as possible.  ████████████

████████████████████████████████████

██████████████████

31.     In June 2025, CD #2 spoke to investigators.  CD #2 said that he had already been told that there was a case on him.  CD #2 knew all the details of the investigation before being provided with discovery, including the fact that there was a picture of him at the post office mailing the parcels.  CD #2 said, "I was told I was wearing a pink shirt.  I was told I drove a black truck [to the post office].  I was told everything."  CD #2 said that he also knew the evidence was sent to the mainland for fingerprint testing.  My investigation has since revealed that VAITUULALA provided confidential law enforcement information to CW #1 who told CD #2.

32.     CD #2 said that VAITUULALA wanted to be the "Larry Mehau"[3] of Maui and to give information to certain people when it benefited VAITUULALA.

---

[3] Larry Mehau was a Big Island cattle rancher, police officer, member of the State of Hawaii's Board of Land and Natural Resources, and the owner of a large security guard business. Mehau "received extensive publicity regarding his

14

According to CD #2, CW #1 receives information from VAITUULALA.  CW #1 confirmed that VAITUULALA would provide him with information regarding ongoing investigations, including the investigation into CD #2.

33.   Well before CD #2 was arrested, he heard that MPD ▮▮▮▮▮ was investigating him. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮ CD #2 asked VAITUULALA about the investigation and VAITUULALA told CD #2 not to worry about it.  CD #2 thinks that VAITUULALA was protecting him because CW #1 was paying VAITUULALA.

34.   On August 7, 2025, VAITUULALA flew from Maui to Las Vegas, Nevada.   On August 8, 2025, CW #1 was in Las Vegas.   According to VAITUULALA's credit card records, VAITUULALA made a purchase at Park MGM in Las Vegas on August 9, 2025.   Casino records show that CW #1 and VAITUULALA were gambling at the same blackjack table at Park Casino at approximately 7:00 p.m. on August 10, 2025.

35.   Casino records show that VAITUULALA normally gambles at slot machines, not tables.  VAITUULALA gambled approximately $30,000 on the trip, despite being delinquent on his mortgage payments prior to the trip.  Casino records show that VAITUULALA typically gambled less than $1,000 on his previous trips

---

associations with political figures in Hawai'i" and allegedly acted as "the godfather of organized crime in Hawai'i." *Mehau v. Reed*, 869 P.2d 1320 (1994).

to Las Vegas. CW #1 told investigators that he had given VAITUULALA a bag containing cash when they were in Las Vegas. ████████████████████████████ ██████████████████████████████████████████████████████████████ ██████████████████████████ CW #1 believed it was during the August 2025 Las Vegas trip when he gave VAITUULALA the most money he had ever given VAITUULALA in a single payment. CW #1 does not remember exactly how much money he gave VAITUULALA. Based upon my training and experience, my conversations with CW #1, and my review of records obtained by subpoena, I believe that CW #1 gave VAITUULALA a large amount of cash and VAITUULALA gambled with some or all the cash.

36.    In May 2026, investigators executed a search warrant for CW #1's person and devices on his person. Investigators approached CW #1 at the Maui airport. CW #1 said that he was going to meet VAITUULALA at the airport and he was going to give him some cash. VAITUULALA had invited CW #1 to go on the trip to Japan, but CW #1 had to cancel at the last minute. CW #1 said that he was going to give VAITUULALA cash because he believed VAITUULALA expected him to pay for the trip because CW #1 always paid for VAITUULALA on previous trips they had taken together. CW #1 had approximately $8,000 in cash in his suitcase. CW #1 said that he planned to give $5,000 of the cash to VAITUULALA.

16

37.    According to CW #1, he continues to pay VAITUULALA when he sees him because he believes that the ongoing payments give him some protection against criminal prosecution. Additionally, VAITUULALA periodically has provided CW #1 information regarding ongoing investigations.

38.    On July 22, 2026, investigators arranged for CW #1 to deliver $2,000 in cash to VAITUULALA. CW #1 described the previous method of cash payments to VAITUULALA and investigators had him set up this payment the same way. After CW #1 landed in Maui, he went to his business. Once at the business, CW #1 contacted VAITUULALA using Instagram and VAITUULALA agreed to meet with CW #1. Because the last time CW #1 had paid VAITUULALA was in April, CW #1 decided to remove his shirt for the meeting so that VAITUULALA would not be concerned that CW #1 was recording the meeting. VAITUULALA drove up in a white truck and CW #1 got in the passenger seat and immediately opened the glove compartment and placed $2,000 inside the glove compartment. CW #1 also told VAITUULALA that he had left his phone at his business. VAITUULALA drove around for approximately twenty minutes and talked to CW #1 and then dropped CW #1 back off at his business. A photo of the truck where the meeting occurred is depicted below:

17



39.    According to CD #2, "everybody" pays VAITUULALA. ███

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████ CD #3 told CD #2 he was not concerned because

he (CD #3) "took care of Mike [VAITUULALA]."

40.    CW #1 and CW #2 also told me they heard CD #3 paid VAITUULALA

so that he would not get arrested for selling drugs.  CD #3 told CD #2 that he paid

VAITUULALA five thousand dollars here and there.

41.	CD #3 said that after he was released from prison several years ago, VAITUULALA would help him.  For example, CD #3 said that he was stopped for a DWI by patrol officers and he called VAITUULALA who had the officers release him from the scene without charges.

42.	CD #3 also said that when he started selling drugs, VAITUULALA knew about it. ████████████████████████████████████ ████████████████████████████████  ████████████ ████████████████████████████████████████████ CD #3 said that VAITUULALA knew CD #3 was selling his cocaine ████████████ When CD #3 saw VAITUULALA at the bars, CD #3 would give him cash. CD #3 said that he would give him at least $1,000 at a time, but generally $3,000 or more.  VAITUULALA, in return, kept CD #3 updated on law enforcement activity surrounding CD #3's drug trafficking.

43.	VAITUULALA told CD #3 not to sell drugs to Confidential Source #1 (CS #1) because he was a confidential source.  CS #1 was, in fact, a confidential source to whom CD #3 sold the methamphetamine and cocaine.  CD #3 said that VAITUULALA was helping CD #3 because VAITUULALA is close friends with Person 3, someone CD #3 is very close to.  Person 3 was also CD #3's methamphetamine source of supply so payments made to VAITUULALA would

19

also protect Person 3.  VAITUULALA told CD #3 to be careful who he sold narcotics to.

44.    In mid-2025, when investigators had CS #1 place recorded calls to CD #3 to set up an additional controlled buy of methamphetamine, CD #3 did not return the call.  Another time, CD #3 said he couldn't talk and CD #3 never called CS #1 back.  Investigators were unable to use CS #1 to purchase additional quantities of narcotics from CD #3.

45.    In mid-2025 Drug Enforcement Administration investigators submitted a wiretap affidavit to the United States Attorney's Office seeking authorization to monitor communications to and from the cellular telephone used by CD #3.  While the affidavit was under review, VAITUULALA violated his duty to maintain the confidentiality of federal investigations by telling CD #3 that the "feds" were going to go up on a wire on CD #3's phone.

46.    CD #2 said that he never saw CD #3 pay VAITUULALA but that he saw VAITUULALA and CD #3 walk towards the bathroom at one of the bars and he believed that CD #3 paid VAITUULALA.  CD #3 said that, in addition to paying VAITUULALA in cash, he would also pay ███████████████ VAITUULALA's ██████ bar bills.

47.    CD #3 was charged in a criminal complaint with possession with the intent to distribute methamphetamine in 2025.  The criminal complaint was sealed.

20

Despite the fact the criminal complaint was sealed, CD #3 said that VAITUULALA told him there was a warrant out for his arrest. The disclosure again violated VAITUULALA's duty to maintain the confidentiality of law enforcement operations. The day CD #3 was arrested on the outstanding warrant, ███████████████ ████████████████████████████ CW #3 asked, "Does Mike [VAITUULALA] know about this?" A search was conducted of CW #3's cellular telephone and investigators found text messages between CW #3 and VAITUULALA from that day. ████████████████████████████████████████ ████████████████████████████████████████

48.    In a later recorded jail call between CD #3 and CW #3, CW #3 said that a "cop" was supposed to be there when CD #3 was arrested. CW #3 said that she had conversations with the officer about CD #3's pending federal case. CW #3 later told investigators that the officer she was referring to was VAITUULALA. On the jail call, CW #3 told CD #3 that she recorded the conversations.

49.    An excerpt of CD #3 and CW #3's February 24, 2026, call is provided below:

CW #3:    That's what I'm saying, like something ain't right. Wait, and then, I, I don't even wanna say it on this phone, but you know who called me? Fucking Dakine [VAITUULALA]. I don't want to say his name.

CD #3:    The cop?

21

CW #3:  Yes, he called me two nights ago at 11 o'clock at night. I'm not even fucking playing with you. And he goes, "Oh, come to Kavas." I said, "For what?" Like literally, with a fucking attitude, though, I was fucking irritated. And he's like, "I gotta talk to you about [unintelligible]." I said, "What? About who?" And he said your name. And I was like, "What the fuck?" I was like, "Bruh." So, my mom, I text my mom, and I was like, "Bruh, you know that fucking Dakine?" She goes, "Yeah." I go, "Fucking Dakine over there?" And she goes, "Yeah." I was like, "This fucker just called me." And she's like, "Nah, no come."

CD #3:  Bruh, who was over there? Say that again.

CW #3:  You know who.

CD #3:  Yeah, no, he, I know who you're talking about [VAITUULALA], but...

CW #3:  He [VAITUULALA] called me and told me to go over there, and he needed to talk to me about something important.

CD #3:  About me.

CW #3:  Yeah.

CD #3:  Okay, can, can you go figure out what that is?

CW #3:  Nah, I don't trust it, I don't fucking trust this shit. Like if I could [unintelligible]

...

CW #3:  You know that day that they came and got you? He was supposed to be there and this bitch wasn't there. What the fuck he doing? What the fuck he doing? Like why, why, you not there? Huh.

CD #3:  Wha…

22

CW #3:      I'm sorry.

CD #3:      That fucker…

CW #3:      It just makes me think, like because, I even, I had a couple times [unintelligible] I met with him like, I fucking put my phone in my fucking pants, I fucking recorded everything, because I [unintelligible]"

50.     After listening to the recorded  jail call, investigators talked to CW #3. CW #3 denied having any recordings of VAITUULALA because when they met, VAITUULALA told her to leave her phone when she got into a vehicle to speak to VAITUULALA about CD #3's case.

51.     CW #3 told investigators that VAITUULALA shared information regarding CD #3's case when they met.  VAITUULALA told CW #3 that he did not think "it" was right, referring to CD #3's case, and that he would try to get CD #3's sentencing to five years instead of ten.[4]  CD #3 believes that VAITUULALA would continue to help him because he paid VAITUULALA for information.

52.     During a March 3, 2026, call between CD #3 and CW #3, CW #3 said she met with "Dakine" [VAITUULALA].  CW #3 said that she could not tell CD #3 everything that happened over the phone because the call was being recorded.  CW #3 said that "Dakine" [VAITUULALA] gave her information about CD #3's case

---

[4] CD #3 is charged in a case in which the mandatory minimum sentence is ten years.

23

that would help CD #3. CW #3 said that when she met with VAITUULALA previously that he did not have any answers for her but that he now had information he could share. CD #3 asked, "Did he [VAITUULALA] tell you to tell me anything?" CW #3 said, "He just said to, no, he told me not to say anything because of the phones, you know." CD #3 asked, "No, I know, but did he say any like uplifting words?" CW #3 said, "He's sorry. I and I was like, bruh." CD #3 laughed and said, "Oh, okay, okay. [Unintelligible]. Tell him apology accepted, fuck you." CW #3 told CD #3 that VAITUULALA was going to call her. Whether or not VAITUULALA had the ability to influence the outcome of CD #3's federal case, he represented to CW #3 that he did. Until October 2025, VAITUULALA was an FBI Task Force Officer and represented himself to be a "fed." Based upon my training and experience, including my conversations and other agents' conversations with multiple cooperating witnesses, and review of electronic communications, I believe that VAITUULALA was representing that he could help CD #3 because CD #3 had paid him on a regular basis to provide information. I believe VAITUULALA was telling CD #3 that he was sorry because despite the thousands of dollars that CD #3 paid VAITUULALA, VAITUULALA did not prevent CD #3's arrest and/or charges.

53. Investigators obtained a search warrant for CW #3's cellular telephone and found multiple messages that were exchanged between CW #3 and VAITUULALA regarding CD #3. On December 4, 2025, CW #3 exchanged

24

messages with phone number (808) 298-9346, saved as "Mich V". T-Mobile phone subscriber information verified that telephone number (808) 298-9346 is registered to VAITUULALA. The relevant messages are below:

CW #3:          Mike it's [CW#3] can you call me? It's urgent

CW #3:          I'm with a federal agent

CW #3:          He pulled me over

███████         ████████████████████████

███████         ██████████████

██████████████████████

███████         ██████████████

███████         ████████████████████████████

CW #3:          Idk what's going on but they know everything
                about me

CW #3:          You can meet before 130? I pick up my babies at 2. I
                know you busy I'm so sorry! I'll take care your ohana for
                the holidays

VAITUULALA:     Can

CW #3:          Ok I'll come to you wherever! I'll wait for the
                word

VAITUULALA:     I'll text you location at 1pm

I believe that CW #3 contacted VAITUULALA when she was stopped by law enforcement because she knew that VAITUULALA would help her. I also believe

25

that they arranged to meet in person because VAITUULALA would not communicate over text message to avoid detection. When CW #3 said she would take care of VAITUULALA's "ohana for the holidays," she was offering to pay VAITUULALA for his assistance.

54.     On December 5, 2025, CW #3 texted VAITUULALA at (808) 298-9346: "I wanted to ask you if they will bother me now knowing I no more DL" [I believe CW #3 was referring to the fact that she did not have a driver's license]. VAITUULALA, using the subject cellular telephone replied: "No ███████████ ██████████". CW #3 texted: "Lol thanks!! I wanna drop something off to you for your ohana whenever you get some time. No rush, just a little gift" VAITUULALA replied: "No ways, you're too kind! I'm here though if you need anything". I believe that CW #3 again offered to pay VAITUULALA for his assistance. While VAITUULALA did not appear to accept payment on that occasion, he offered to provide further assistance to CW #3 if she needed anything regarding law enforcement actions.

55.     On December 6, 2025, CW #3 texted VAITUULALA at the subject cellular telephone: "Afternoon, Hey any word on his [CD #3's] charges? ██████████ ████████████████████████████████████████████████████" VAITUULALA replied: "Not sure yet but I'm thinking, PROMOTING A DANGEROUS DRUG IN THE FIRST DEGREE".

56.     CD #3 described receiving help from VAITUULALA as early as 2019, when he was stopped for a DWI and VAITUULALA got him out of it.

57.     On January 1, 2026, multiple witnesses confirmed that VAITUULALA was present at Person 3's home on Maui where illegal fireworks were being displayed.  A neighbor's house caught fire as the fireworks were being set off.  According to CW #1, VAITUULALA allowed the importation of fireworks and has also received illegal fireworks on more than one occasion.  CW #2 said that on one occasion CW #1 asked him to drop off fireworks to MPD Officer 2 on behalf of VAITUULALA.



58.    According to CW #2, Person 4, a relative of VAITUULALA, sells fireworks for CW #2.  VAITUULALA approved the use of illegally transported fireworks at CD #2's graduation party and at an event for Person 3.  CD #2 said that VAITUULALA also approved CW #1's illegal fireworks.

59.    For many years VAITUULALA has used his position in the Maui Police Department for personal gain.  Both CW #1 and CD #3 paid VAITUULALA on multiple occasions over an extended period.  VAITUULALA improperly and illegally disclosed the identities of confidential sources, evidence photos, a pending secret wiretap, and specific information regarding ongoing federal investigations into the perpetrators and coconspirators.  VAITUULALA instructed criminals to use encrypted applications and burner phones to communicate to avoid detection by law enforcement.  VAITUULALA also took steps when meeting in person with CW #1, CW #2, CW #3, CD #2, CD #3, and others to conceal the nature of the meetings.

60.    CD #3 paid VAITUULALA for information regarding the investigation into CD #3's drug trafficking activities.  CD #3 said the payments were to protect him from being arrested and charged.

61.    CW #1 paid VAITUULALA to allow CW #1 to run illegal chicken fights on Maui and to provide information regarding criminal investigations.  CW #1 primarily communicated with VAITUULALA over Instagram to set up in-person meeting where he would pay VAITUULALA in cash.

62.   I am aware that Instagram communications originating or received in Hawaii necessarily move in interstate commerce through wire communication facilities since Instagram servers and facilities are outside the State of Hawaii. As set forth above, a primary means of communication in furthering the objectives of the honest services wire fraud scheme charged was the use of confidential Instagram communications between the primary co-conspirators.

29

## CONCLUSION

63.     Based on the facts described above, and on my training and experience,

I submit that there is probable cause that MICHAEL VAITUULALA committed the

crime of conspiracy to commit wire fraud by devising a scheme to defraud and

deprive the residents of Maui of the intangible right of honest services in violation

of Title 18, United States Code, Sections 1343, 1346, and 1349.

Dated:  Honolulu, Hawaii, July 31, 2026.

Bryanna Jones
Special Agent
Federal Bureau of Investigation

Sworn to under oath before me telephonically, and attestation acknowledged pursuant to Federal Rule of Criminal Procedure 4.1(b)(2), on this _31_ day of July 2026, at Honolulu, Hawaii.

Based upon the foregoing, the undersigned Judicial Officer finds that there is probable cause to believe that the above-named defendant committed the crime charged in this Criminal Complaint, this _31_ day of July 2026.



Kenneth J. Mansfield
United States Magistrate Judge

30